1564 Daiichi Pharmaceutical v. Apotex Mr. Breisblatt, good morning. Welcome. Please proceed. Good morning, Your Honor. Robert Breisblatt on behalf of Apotex. Your Honor, Mr. Seacrest has some charts, which are blow-ups from various exhibits that were used and referred to, and we might, during the trial, we might refer to them again as we begin our argument. I believe they're all on the record before us. We have them right here on the bench. The individual documents are, but in some cases we've either pulled out a part of it to highlight it, or we've put sections of the document together. Mr. Seacrest, up to you. I myself normally find that they're more of a distraction than a help, but the choice is entirely yours. Thank you, Your Honor. The first issue we raised in this case is that the trial court erred as a matter of law when it reported safety into Claim 1 of the patent issue. What the court did is it took the phrase, an amount effective to treat, and he changed the word effective to mean efficacious and safety. We believe that that was error, that the inventors at no time attempted to put the word safety into their claim, and there was no support for it. And, as we'll see later, the fact that Afloxacin is safe is an inherent characteristic of Afloxacin. Yeah, but the question is whether the prior art suggested treating ear infections topically with this. And, you know, cats and dogs don't do it for me, okay? It seems to me you've got two references here which might help you. One of them is Heroda, and the other one is Gans. And Heroda talks about using Afloxacin in the auricular cavity. There seems to be a difference of opinion by the experts as to whether that means the ear canal or not. What's the answer to that? Does it mean the ear canal? We believe it means it does, and we believe even if one takes the position it doesn't mean the canal itself, it means the ear, and claim one, which we put up here, doesn't limit the treatment of otopathy simply to the ear canal. In fact, what it says is a method for treating otopathy which comprises the topical otic administration of a mountable Afloxacin or a salt thereof, affected to treat the otopathy in a pharmaceutically acceptable carrier to the area affected with otopathy. There is no dispute that auricular means ear, and that was never disputed. And, if we all look, our ear and our ear canal is made of the same skin, and every witness testified about that. So we think Heroda clearly anticipates claim one. Tell me why auricular cavity should be understood to mean the canal. Well, because auricular means ear. I don't think there's any dispute about that. There's no dispute about that. And canal, when you look at the ear, a canal is a cavity. It's a cavity. It's a cavity. I mean a canal and cavity in this case is the same thing. Well, not according to the dictionary that was put in evidence. I don't think the dictionary that was put in evidence said it was not, that cavity and canal are exactly opposite. Both cavities have a tube and a cavity. As I recall, subject to being corrected, it said that the auricular cavity was the part of the ear outside of the head. And the ear canal is inside of the head. If I may, there was no dictionary that said that. In fact, that was the issue. There was no dictionary definition specifically for auricular cavity. There was a dictionary definition for auricular, which meant the ear. And that was the only dictionary definition that went in. I frankly don't remember a dictionary definition specifically for auricular cavity. In fact, that was one of the disputes at trial. I think it was even Dietschy's expert that said it was an arcane word. But I'd like to go back to something, Judge Dike, that you mentioned. And that was cats and dogs doesn't do it for you. There was nothing in these claims that limit this to human use. And there was evidence that in fact dogs do suffer from malaria. With respect, that seems to me to be a very difficult position for you to maintain. This patent is about treatment of infections in the human ear, not cats and dogs. But you can argue that if you want to, but I don't find it very persuasive. Well, I am going to argue that, because when one reads the specification in this case, there's no mention of human at all. And that's a very significant issue, because when you get down to grow, where they're talking about the same microorganisms, and each of the experts admitted it, the microorganisms that grow this, that he says ofloxacin is safe to treat, each of those microorganisms are the same microorganisms that make up otitis media and otitis externa. Even the trial court found, and never said, just because it said dogs and cats. Do you lose this case if we decide that this patent is limited to a method of treating humans as opposed to cats and dogs? No, because of Heroda and because of the other prior art. But I think grow is a perfect piece of the anticipatory art. It has every claim. In fact, if one goes to the court's opinion, where it talks about grow, and it talks about everything that grow teaches, and that, again, that discussion by the court begins on page 837. At each paragraph, the court talks about grow teaching the use of gyrase inhibitors and specifically talking about ofloxacin. He then goes on and talks about that it's applied topically, as a topical preparation for the treatment or prophylaxis of infectious diseases and injuries of the skin. That's in grow. And grow isn't limited to cats and dogs. It just so happens that its direct statement about otitis, and it's the desotitis that's being talked about treated here, that was in the reference of dogs and cats. But the rest of grow specifically talks about ofloxacin, talks about its use as a solution, gives the same percentages that are in this patent, talks about it being used to treat the bacteria that makes up otitis. There is nothing missing from grow, and even the district court judge didn't find anything missing from grow except he didn't find a discussion of safety that rose to the level that he needed. And even this district court judge, when he talked about borota, was stuck with the same position, and he says, when he compares borota to grow, he says, well, at least grow mentioned otitis. So this district court judge wasn't impacted about the fact that otitis referred to cats and dogs, nor was the examiner. The examiner's one reference to grow, and he doesn't go on to say anything more, points out the very section in grow that referred to otitis. So the fact that grow doesn't specifically say otitis in humans doesn't mean that it isn't an anticipatory reference to this patent, which again doesn't mention humans. I thought the district judge said the missing claim limitation was where you apply it, whether you apply it to the skin or whether you apply it to the point in the skin where the infection is lodged. Well, of course, grow says you apply it to where the infection is lodged. That's part of grow's disclosure, and I think the district court judge actually found that when he said When he talks about apply topically, and this is on page 838, apply, and he refers to grow, teaches that afloxacin is among the group of gyrase inhibitors that can be applied topically as topical preparations for the treatment or prophylaxis of infectious diseases and injuries of the skin. And I think that's showing that you're applying it to the skin. No question you're applying it to the skin, but it could be to skin elsewhere so that it goes into the bloodstream and fights the infection on a systemic level. That's the very reason why this patent added that not only do you apply it topically, but you apply it topically to the area affected with the bacteria. But as even Daiichi's expert admitted, everyone prior to the application date of this patent knew that you could apply afloxacin topically in an eardrum. I mean, if you're applying it to the eye and cats, logic tells us if you're going to try and treat a disease like otitis media or otitis externa, why would you put a patch on your elbow? Why would you put a patch on your knee? What you're going to do is you're going to take the solution that Grove teaches you how to make. It might be a lot safer is the answer. Well, but the answer to that question is there was no evidence that afloxacin, even taking systemically in a tablet to cure otitis, caused any ototoxicity. Do we have different standards of safety for cats and humans? The FDA doesn't require you to test products to give to cats. So it's okay to give something to a cat where it wouldn't be okay to give it to a human? Well, no, I'm not saying that. In fact, one could take, then, the teachings of Grove. Same safety standards for cats and people? Safety would be inherent. In other words, it's inherent. If you can give it to a cat, it's automatically safe to give it to a human. Well, in this case, the only thing they do in the specification is they put it in a guinea pig's ear. Are we saying that because it was safe to inject it into the middle ear of a guinea pig, it's safe to give it to a human? There is no other teaching in the specification of this patent about applying afloxacin to a human being. In fact, what they did in the three tests that they tout to teach safety is they injected it into the middle ear of a guinea pig, and that's it. You know, counsel, you're already into your rebuttal time. I would have thought that what you wanted to focus on and lead with is the weakness in the judge's rejection of the obviousness case that you presented. And instead, you're talking about cats and dogs and anticipation, which seems to me to be far off the center of gravity in this case. Your Honor, I'm answering the questions that I will ask, and I want to reserve my rebuttal time. And we rely on our brief, which I think carries the full argument on the obviousness and the court's error, particularly when you look at the recent decisions of this case on Baxter. You don't want us to get distracted by looking at obviousness, right? Well, I think we have a clear case on anticipation, frankly. You know, if the court asked me what our strongest position was, I would say it's anticipation. But we also have the case on obviousness that's laid out, I think, significantly and successfully in the brief. Well, it's very fully set forth in the brief, and you're quite right. None of that is abandoned. So you can reserve your rebuttal time, and we'll hear from Mr. Murphy. Thank you. Thank you, Your Honor. Your Honor, and may it please the court, there is no basis to overturn the district court's judgment in this case. What about Gantz? What about Gantz? which seems to me clearly teaches using this for treatment of ear infections by ciprofloxacin, and the record shows that everybody would recognize an equivalency between oploxacin and ciprofloxacin. Your Honor, that's contrary to the facts in the record. What facts? First of all, Gantz involves ciprofloxacin, not oploxacin. I understand that, but if you substitute the word for ciprofloxacin in the Gantz reference, it would be anticipatory, right? It would not, Your Honor, because even if you assume that hypothetical, and there's no basis in the record to do that, but if you did, there is still no evidence in the record in Gantz or by any of the experts who testified about Gantz that such administration would be a safe and efficacious treatment. They administered it to the patients. Well, but it would be inherent. If they suggested administering it to patients, it would be inherently safe, right? It would not, Your Honor. Why not? And the reason is because, and that's why the claim is very narrow, and it's quite important that the claim narrowly limits the invention to topical otic administration into the ear of an amount of oploxacin that is an effective treatment, and the judge construed effective treatment to be safe and efficacious. In other words, safe and efficacious enough to be used as an effective treatment when topically treating patients in the ear. Gantz says absolutely nothing about whether the treatment was safe and efficacious. But it suggests treating people with an antibiotic for ear infections, and that is inherently safe, right? It is not, Your Honor. Why not? It's not because of two reasons. One, it's a different drug, and there is testimony that every drug… No, but I was asking in the hypothetical. Understood. Please assume for the moment that it's the same drug, or that they're equivalent, okay? Understood. Why isn't Gantz, if you would make that assumption, anticipatory? Because you cannot assume that the administration topically of a drug is safe and efficacious unless you have some testing, some evaluation of whether that concentration, and again, this is at the time of the invention, April 8, 1988 is the priority date. You need some evidence, some tests, and in fact, this Court's decision in Rappaport v. DeMint is very closely analogous. That was a method for treating sleep apnea, and the prior art said you need tests to confirm the safety of the claimed method of treatment, which is not in Gantz, even under the assumed hypothetical that Your Honor posits. So what you're saying is if the prior art discloses treating human ear infections with a particular antibiotic, you can get a patent on that antibiotic just by adding the feature of having run the test. I'm not saying that, Your Honor. I'm saying in this case it's patentable because the entire basis for the invention is throughout the specification, throughout the prosecution history. The safety was paramount and critical because every known antibiotic that had been administered topically to treat ear infections prior to the Da'ichi invention was known to cause ototoxic effects in the ear, and it was prescribed for such use in the labeling by the FDA. I don't understand that. I mean, here's Gantz, and under my hypothetical we're going to assume it's the same antibiotic, and it says use this to treat ear infections, and it says don't use it except in the most serious cases because they're worried about, I suppose, mutation of the bacteria or whatever. But it does suggest it, and doesn't that impliedly suggest that it would be safe to do it? It doesn't, Your Honor. And there was testimony by Dr. Dilhart, Da'ichi's expert, in the case that, first of all, Gantz specifically was directed to ear physicians called otologists, not to one of ordinary skilled in the art. Whoa, whoa, whoa. I thought their assumption of the cases was that someone skilled in the art would be aware of the prior art references. Oh, absolutely, Your Honor. So we have to assume that someone skilled in the art would be aware of this reference and would have read it. Why wouldn't this reference, if read by someone skilled in the art, suggest using this antibiotic for the treatment of human ear infections by topical application? Because one of ordinary skilled in the art, and there was testimony accepted by the court, by Da'ichi's expert, that one of ordinary skilled in the art, having assumed that they read this art, would need tests, clinical trial tests, or at least the type of laboratory animal experiment tests in the patent, in order to have a basis to use a drug, an experimental drug, in the ear, and to believe and to understand one of ordinary skilled, that it was safe and efficacious to do so. And Gantz specifically says that you should not do this, only in the most extreme circumstances, and only if an otologist, an ear specialist, who is not one of ordinary skilled, is specifically the person to accomplish that administration, because it's so experimental, no one knows whether it would be safe. And so the legal test of what one of ordinary skilled in the art would understand is not satisfied. I don't see Gantz as suggesting that there was concern about the safety to the individual. It seemed to me, in reading it, that it was concerned about the desensitization, the overuse of this antibiotic. Am I mistaken about that? I think there's more to it, Your Honor. One point of clarification while I find Gantz. 6115. So the record is clear, Your Honor. Gantz is an article published in the German language. There's no translation in the record. The only thing in the English language is the first paragraph summary, which is on A11599. It's on the left-hand column at the very beginning of the Gantz article, Your Honor. And the last two sentences of that summary said, for local treatment in the ear, they should be used only in difficult cases and exclusively by the otologist. This treatment must not be used to replace proper cleansing of the ear or necessary operation. And that's all it says. And in fact, the district court considered that to be a teaching away from the invention. And the expert testimony was that Gantz did not place this disclosure in Gantz, this one-paragraph English summary, could never place a person of ordinary skill in the art in the possession of the claimed method of treatment. Because it's written in German? Well, Your Honor, they could. The defendant, it was their burden to prove by clear and convincing evidence that this article somehow discloses Dietschy's invention. Yeah, but I thought we assumed that someone skilled in the art would be possessed of the prior art. And presumably, our assumption has been possessed of the prior art in English, so they could understand it, right? That may be, but this article is not in English, and there is no English translation in the record. So we should ignore it because it's in German? Yes, for purposes of this record. What case tells we should ignore prior art because it's in a foreign language? It's not a question of ignoring the art, Your Honor. It's a question of understanding what the art says. There is no testimony in the record, nor is there any translation about what it says. The only testimony at trial, and it was a disputed issue of fact, concerned the first paragraph, which everybody understood because it was in English. It's a question of whether the defendant met its burden of proof. It's a simple matter to put in a certified English translation. We do it with cases all the time, and the experts testify based on a certified English language translation. Well, what do we have here? We have an English translation. What's the matter with it? We don't have an English translation. We don't? Just one paragraph. No, but what... Am I mistaken? What is it at 12773? Isn't that Gantz? Am I mistaken here? That's Gantz, isn't it? It's in English. It is, Your Honor. Well, then why did you say it wasn't in English? Sorry, my mistake. I was mistaken, Your Honor, and you're correct. However, my point is that the testimony at the trial, there was no testimony on that English translation. There was no testimony about one of ordinary skill in the art and what one of ordinary skill would take from the Gantz article, even with the English translation. It was never—there is no record on which this court can overturn as clearly erroneous a finding of fact made by the district court, who, for reasons known only to the defendant, chose to rely only on the one-paragraph English summary in the Gantz reference. And, in fact, that was a contested issue of fact, the subject of different viewpoints by the experts, and the judge credited the testimony of Daiichi's experts. And there's no showing on appeal as to why that's clearly erroneous, when, in fact, there is evidence to support the view that Gantz— to make that assumption, but even if you did, there's no clear error in what the district court found that Gantz teaches away from the invention. Based on this record, there's citation to testimony on Gantz that supports the district court's fact-finding that Gantz does not invalidate this fact on the question of obviousness. It was never an allegation of anticipation, as there could not be, because Gantz does not disclose aphloxacin, does not suggest substituting aphloxacin. And, in fact, Daiichi's expert, Dr. Dohar, said you would never make such substitution, because every drug is different, every drug has its own unique safety and efficacy profile, and that one of ordinary skill in the art traditionally looks to such clinical tests, laboratory animal experiments, such as are disclosed in the 741 patent, for assurances that if you did experimentally treat a patient by topically administering the drug into the ear to treat an ear infection, you would be doing so understanding that it would be safe and efficacious. And the district court went even further in footnote 24 of his decision, pointing out testimony by one of the inventors, that any doctor who even thought about doing so without the benefit of such clinical studies was putting his patient at risk. And that's why the claimed invention was claimed the way it was, that the topical otic administration of aphloxacin is effective, an amount of aphloxacin, is effective to treat theotopathy and must be in a pharmaceutically acceptable carrier administered to the area that's infected. And I would like briefly, I think also, to point out to Your Honor, with regard to the Heroda reference that counsel mentioned again, a point of disputed fact at the trial was whether Heroda, in disclosing the words auricular cavity, whether that would include the external auditory canal. The claimed invention requires topical administration into the ear, which is to the external auditory canal or middle ear. That is undisputed. Heroda says can be applied to the auricular cavity. It was a disputed issue of fact, and on page 845 of the record, which is page 30 of the district court's decision, the district court said that it does not credit Robinson's testimony that the auricular cavity includes the external auditory canal. That is a credibility finding for which there is no basis to overturn on appeal. Well, the problem is there was also testimony by Hain, I think, of the same effect. And even though one might dispense with Robinson's testimony on the theory that he wasn't an expert, he did have the Hain testimony. There does seem to be a conflict in testimony not really recognized by the district court in that passage. Your Honor, that may well be, but for purposes of appeal, I say it doesn't matter because it's the defendant's burden on appeal to show a clear error in the fact finding, which they have not done. If the court didn't credit Robinson's testimony, there's no indication why it's an error because Dietschy's expert and the dictionary definition on which Dietschy's expert relied for the word auricle and what it would mean to a person of ordinary skill was directly to the contrary. And that's what was accepted by the district court at the trial. So I did want to make that point of clarification in case it wasn't clear. May I briefly conclude, Your Honor? If you have something new to say. No, thank you, Your Honor. Mr. Breitscheid? Your Honor, to answer Judge Michelle's question. I believe the Grotter reference teaches very specifically that the topical preparations of the present invention can be administered directly, applying an appropriate amount to the effective part. And I'd like to talk about obviousness and answer, I think, or illuminate a little bit more on what Judge Dyke was saying. Is Mr. Murphy correct that there is no expert testimony about Gans rendering this invention obvious? No. In fact, both of our experts took Gans and did what they're supposed to do for obviousness. Gans combined with Grotter. Gans combined with Grotter. And both Dr. Robinson and Dr. Hayne both said when you combine those two references, it is obvious. When you look at Gans and you start with, it says local treatment of 20 chronic bacterial ear infections with the gyrase inhibitor ciprofloxacin. And remember, Grotter treats ciprofloxacin and olfloxacin the same. Grotter talks about olfloxacin. Katz talks about the gyrase inhibitors and puts olfloxacin in there specifically. One skilled in the art would have known that all of these gyrase inhibitors are being treated the same and would expect the same result. And they go on and test it directly in the ear, as this court noted. When you combine this teaching of Gans with Grotter, as our experts said, this patent would be obvious to one skilled in the art. And that's the test, not just looking at Gans by itself, but it's Gans combined with the other pieces of prior art. Be it Grotter, be it Lenard's where they're testing oral olfloxacin and they're not finding any side effects. Be it Grotter where they set out the very percentages that are encompassed in this patent. If one is going to look at this as obviousness, one would find a clear case when you take Gans and combine it with Grotter and combine it with Perrotta. Where do we find that testimony in the record? There would be Dr. Haynes' testimony on direct examination. If I may have it. Dr. Robinson talks about... Never mind if you can't find it. Your Honor, I apologize that I can't find it right offhand to see if it's been cited in here. I remember very specifically at the trial, because we talked about those three and it might be cited in our brief, Gans was always compared with Grotter and Perrotta when they talked about obviousness and prior art. And you have to combine these. Thank you. All right. I thank both counsel. We'll take the case under review. All rise. The court is adjourned until 2 p.m. this afternoon.